[Faire v. The State.]

# Faire v. The State.

## Indictment for Murder.

1. *Dying declarations; admissibility of.*—Deceased was cut, about six o'clock in the evening, with a knife, in the lower portion of the left side, below the ribs, so that about an inch and a half of his intestines protruded, and died on the evening of the next day. Shortly after the wound was received, a physician dressed it, without expressing any opinion as to its character, and about this time deceased stated to persons in his room, that "he was going to die;" that "he would die in fifteen minutes." One of these persons tried to cheer him up, but it seemed to have no effect; and another witness afterwards told deceased he would get well, but deceased "insisted all the time he would die." He made statements about the cutting and as to who did it, shortly after the wound was dressed, to the persons then present, and after expressing this opinion of his condition. *Held:*
The declarations were rightly admitted as dying declarations.

2. *Same; province of jury as to.*—To justify the admission of dying declarations, they must be made under a conviction of impending death, and must be confined to facts and circumstances immediately connected with the mortal injury. The court alone determines their admissibility; their credibility and sufficiency being matters for the jury.

3. *Malice or motive; how proved.*—Previous malice or motive to take the life of deceased, may in general be proved against one charged with the murder; but it must be proved as a fact, and not as hearsay. It is not permissible to show that deceased, prior to the killing, had a conversation with a witness about a particular robbery, during which he spoke of the prisoner.

4. *Shackling prisoner on trial; rule as to.*—It requires an extreme case to justify shackles or manacles on a prisoner undergoing trial; but whether or not this is necessary, must be left to the enlightened and conscientious discretion of the lower court, in view of all the circumstances of the particular case; and the exercise of that discretion can not be reviewed on appeal.—(BRICKELL, C. J., *dissenting on this point.*)

APPEAL from City Court of Mobile.

Tried before Hon. O. J. SEMMES.

Dan Faire *alias* Dan Farrell, was convicted of the murder of Peter Cornell, and sentenced to be hanged.

On the trial the State introduced one Neil, who testified that hearing Cornell had been cut, he went to his room and found deceased in bed. Witness then went to the guard-house and reported the cutting, and returned about ten o'clock that night, when either the witness or officer Dupree, who was then present, asked Cornell how he felt. "Deceased replied that he was going to die; that he would die in ten or fifteen minutes. One of us then asked, who it was that cut him. Deceased said, as he was coming towards the mill along the sidewalk, he heard some one following him, who shortly afterwards called him. He stopped and turned

around, and that as he did so, the person came up and he (deceased) asked what he wanted, when the person stuck a knife into him, saying, take that, you d—n son of a bitch. At this time he recognized the person as Dan Faire. The deceased then gave witness a description of the man, who he said had cut him, and said that officer Pendergrast would know the man who stabbed him on account of the Walsh robbery." On motion of the defendant the court excluded that portion of this testimony, to the effect that the cutting was done about the Walsh robbery. The witness also stated that Cornell seemed to be impressed with the belief that he would die from the wound.

Deceased was cut about six o'clock in the evening. The wound was a smooth cut, about one and three quarters of an inch in width, on the lower portion of the side, below the ribs, and before it was dressed, his intestines hung out about an inch and a half.

Officer Pendergrast was then introduced, and testified that he knew the prisoner, and had known him some time. He was then asked by the solicitor: "Did you have any conversation with the deceased, prior to the alleged killing, about the Walsh robbery? The defendant objected, but his objection was overruled, and the court told the witness to answer "yes" or "no," and he answered "yes," and defendant excepted. The solicitor then asked, who the conversation was about. The defendant objected, but the court overruled the objection, telling the witness not to state the conversation, but only to give the name of the person, and the defendant excepted. The witness answered: Dan Faire. Officer Dupree, who was in the room when deceased was talking to Neil, testified substantially to the same declarations as Neil did, with the exception that this witness said deceased called the name Dan *Farrell*, and not Dan Faire. He further testified that he heard deceased say he was going to die from the wound. "Deceased was much excited and frightened, at the time he made the statement, and witness tried to cheer him up, by telling him that he was not going to die, as he (witness) had once seen a man cut much worse than he was, who got well; but witness did not think his words had any effect in changing deceased's opinion as to his condition."

Another witness stated, that when Neil and Dupree first came the wound had not been dressed, but on their return, between ten and eleven o'clock, it had been dressed by the doctor, who expressed no opinion whether the wound was fatal or not. This witness testified to the same declarations by deceased, as Neil had previously testified; except that

the witness stated deceased said Dan *Farris* cut him. "Deceased was a Welshman, and always pronounced his words with a rolling R." Witness remained with deceased until a late hour that night, and heard him say he would die from the wound; witness tried to cheer deceased, but it seemed to have no effect, as deceased insisted all the time that he would die." It seems that deceased was employed in some oil mills, and when this witness, who was connected with them, was about to leave, deceased said "I will not get up steam for you in the morning." Deceased died about three o'clock, on the evening after he was cut.

"This being all the evidence as to the dying declarations of the deceased, and there being no direct evidence of the cutting, defendant moved to exclude them from the consideration of the jury," but the motion was overruled, and the "declarations allowed to remain before the jury," and defendant excepted. "The physician who dressed the wound of deceased, though a resident of Mobile, was not called as a witness by either side. No one but the deceased and the party alleged to have done the cutting were present or saw the same, which occurred on a cloudy night in a dark portion of the city of Mobile, a street lamp being on the opposite side of the street, about sixty yards distant."

The defendant requested the following charges in writing, and separately excepted to the refusal of the court to give them :

"1. The court charges the jury that dying declarations are admissible from necessity only; and because made in extremity, and when the party firmly believes that death is impending, and when every hope of this world is gone ; when every motive to falsehood is silenced, and the mind is induced by the most powerful considerations to speak the truth ; and unless they believe from the evidence, that such were the circumstances under which Cornell's dying declarations were made, they ought to give them no weight."

"2. The jury ought not to give the alleged dying declarations of deceased any weight, whatever, unless they believe from the evidence that deceased understood and realized he was under the same solemn duty to state all that he knew, which would amount to a defense for the prisoner, as he would be if a witness, under such oath. Declarations are received, because they are supposed to be made, while the dying man is under a solemn sense of his duty to state the truth, the whole truth, and nothing but the truth, in reference to the accused's guilt or innocence of matters of which the declarant speaks; and if the jury are not satisfied from the evidence, that the declarant was in this state of mind

when he made the declarations, they ought to give the prisoner the benefit of the doubt, and reject the declarations entirely."

"During the trial and after the plea of not guilty, and after several witnesses for the prosecution had given in their testimony, prisoner's counsel discovered, for the first time, that defendant, who sat in full view of the jury during the whole trial, was shackled with leg irons—that is, two clasps, one on each ankle, connected by an ordinary iron chain, about eighteen inches long, and about an inch and a quarter in diameter. When defendant pleaded and during the first day of the trial, he was unshackled, but the shackles were on him when the trial commenced on the second day, and remained on him the rest of the trial. During the time the prisoner was in shackles, several witnesses were examined, the case argued to the jury, and they charged by the court. As soon as the prisoner's counsel noticed the shackles, he called the attention of the court to the fact, that defendant was being subjected to a trial in irons, whereupon the court replied that it was done by order of the court on representations made by the sheriff. Defendant's counsel then made a motion to have the irons removed, whereupon the court ordered the sheriff to be sworn as to the cause of the shackling; whereupon defendant, by his counsel, stated that he did not want this done, as he did not know what the statements of the sheriff would be, and thereon defendant withdrew the motion, but asked the court to note what had taken place relative to the prisoner's being tried in irons, and allow an exception thereto, which was granted by the court.

"The representations made by the sheriff, and which were the cause of the court ordering the irons to be kept on the defendant during his trial, were made to the court in open court, but not under oath, and inaudibly to any save the court, and not in a voice to be heard either by the jury, the defendant, or his counsel; and were in substance that the prisoner stated to the sheriff, who had him in charge, that he would rather die than be hung or sent to the penitentiary, and if the jury found him guilty, he would not come out of the court-house alive, as he would escape or the officer would have to shoot him. The sheriff further stated, that from the character of the man, and his conduct in jail, he entertained serious apprehensions that the prisoner would attempt to escape, and create a scene in the court room, if not secured. The court told the sheriff to take the necessary precaution to prevent his escape, but not to place the irons on his hands, and make it as little apparent as possible, and not in the presence of the jury, and this was done. During

[Faire v. The State.]

the trial, from its commencement to the end, the prisoner made no attempt to escape, but remained quietly in his seat. Defendant's counsel knew nothing of said threats, nor did he or the defendant know, until after the trial was ended, what the representations to the court. had been. And defendant objected and excepted to each and every, and all rulings, decisions, and refusal to charge, and to the refusal of the court to have the shackles removed from his ankles," &c.

The admission of the dying declarations; the refusal to exclude the statements about the Walsh robbery; the refusal to give the charges requested, and the rulings and act of the court in subjecting the prisoner to trial in irons, are each assigned as error.

SAFFOLD BERNEY, for appellant.—The court should have rejected the dying declarations. They were but the unsworn, unguarded statements of a frightened and excited man, who was, at the time he made them, being constantly cheered with hopes of recovery. It is common for persons, who are seriously wounded, to say they are "dead," or "will die"— just as the deceased said he would "die in fifteen minutes." It was not satisfactorily shown, that he was under a sense of impending dissolution, and had utterly despaired of recovery.

2. Besides this, the declarations ought to have been excluded for another reason. These declarations were the only direct evidence connecting the prisoner with the cutting. The offense was committed on a cloudy night, in a dark part of the city, and the declarations, as proved, conflicted as to the person who did the cutting. One witness says deceased said it was Dan *Faire*; another that it was *Farris*, and still another, that it was *Farrell*. Under these circumstances the declarations, even if properly admitted, were too uncertain, vague and unsatisfactory to authorize the jury to find beyond a reasonable doubt that the prisoner did the cutting. Admitting all the evidence to be true, it should be excluded on motion, if it will not authorize a verdict.

3. The evidence as to conversations about the "Walsh robbery," was, at most, mere hearsay. It was not shown to have any connection with the cutting, and its only effect was to prejudice the jury.

4. The court erred in subjecting the prisoner to a trial in irons. It was not shown to the court that there was *evident* necessity for ironing the prisoner during the trial.—Blackstone's Com. B iv, ch. xxx. That author uses the words, "*evident danger* of escape." The representations of the offi-

VOL. LVIII.

[Faire v. The State.]

cer, which caused the order, were unofficial, and not sworn to. Trying the prisoner in irons, prejudiced his case before the jury. It was equivalent to a declaration by the officers, that the prisoner was such a bad and desperate man, they were afraid to trust to other methods to keep him in custody. The prisoner had no opportunity to deny or disprove the alleged threats and conduct imputed to him. The precedent sought to be established in this case, is a most dangerous one. All that a sheriff or officer, who has ill-will to the prisoner, has to do, is to make an unsworn statement to the judge that the prisoner is dangerous or made some loose threat, and an order is made to iron him during trial. In this way, the most harmless and inoffensive man can be manacled, without a hearing, and without any remedy.

JOHN W. A. SANFORD, Attorney-General, *contra.*—The charges refused sought, in effect, to have the jury review the decision of the court, that the declarations were admissible. The other charge, to say the least of it, was abstract. Both were properly refused.— *Washington & Lewis v. The State,* 53 Ala. 29 ; *Eiland v. The State,* 52 Ala. 322. "The fact that shackles were kept on the prisoner, to prevent violence or an attempt to escape during the trial, furnishes no ground for reversal of the sentence."

STONE, J.—The witness, Pendergrast, was permitted to testify, against the objection of defendant, that in a conversation between witness and deceased, had prior to the alleged killing, the deceased spoke of the prisoner, Faire, during a conversation which related to the Walsh robbery. What was said was not permitted to be shown ; but the evident tendency of the testimony, and the order in which it was stated, was to connect the prisoner's name with the 'Walsh robbery.' This was clearly irrelevant. It was but a repetition of unsworn hearsay, and we can not perceive its materiality, if proved as a fact, offered alone as it was, without any surroundings, or connecting circumstances. Connecting his name with a robbery, could not fail to stimulate or engender a prejudice against him ; and there is nothing shown to connect it with the homicide, or with a motive for its commission. Previous malice towards the deceased, or a motive for taking his life, may, as a rule, be proved against any one charged with murder ; but it must be proved as a fact, not as hearsay.— *Campbell v. The State,* 23 Ala. 44 ; *Ingram v. The State,* 39 Ala. 247 ; *Balaam v. The State,* 17 Ala. 451 ; *Magee v. The State,* 32 Ala. 575.

The question of the admissibility of dying declarations, is for the court's determination. The jury passes upon their

credibility and sufficiency, but not upon their admissibility. To justify their admission, they must be made under a conviction of impending death, and, in scope, must be confined to the facts and circumstances immediately connected with the mortal injury.—1 Brick. Dig. 511, 512, §§ 891, 892, 893, 894. The rulings of the city court on this question are free from error.—*Edgar v. The State*, 43 Ala. 45.

It should be an extreme case to justify shackles or manacles on a prisoner undergoing trial. Sir Wm. Blackstone, 4th Com. 322, says : "The prisoner must be brought to the bar without irons, or any manner of shackles or bonds, unless there be evident danger of an escape, and then he may be secured with irons." And, as we understand the principle we are discussing, all the authorities agree substantially with what is said by Sir William Blackstone. In Hale's Pleas of the Crown, vol. 2, p. 219, it is stated thus : " The prisoner, though under indictment of the highest crime, must be brought to the bar without irons and all manner of shackles or bonds, unless there be a danger of escape, and then they may be brought with irons." In Layer's case, the Lord Chief Justice said, "As to the chains you complain of, it must be left to those to whom the custody of you is committed by law, to take care that you may not make your escape; when you come to your trial, then your chains may be taken off."—16 Howell's St. Trials, 94. In Waite's case, 1 Leach, 33, the Court said, "The prisoner, at the time of his arraignment, desired that his irons might be taken off; but the court informed him that they had no authority for that purpose until the jury were charged to try him. He accordingly pleaded not guilty ; and being put upon his trial, the court immediately ordered his fetters to be knocked off." Waite was indicted for grand larceny, in the theft of six East India bonds, of £100 each, the property of the bank of England. The principle is thus stated in 1 Bish. Cr. Proc. § 731 : " The prisoner, on his arraignment, though under an indictment of the highest crime, must be brought to the bar without irons and all manner of shackles and bonds, unless there be a danger of escape, and then he may be brought with irons."

As we understand the foregoing authorities, from the learned Blackstone down, there is no absolute, unbending rule, that a prisoner on trial for crime shall, in no case, be fettered. Even in Harrington's case, 42 Cal. 165 (the only case brought to our notice, in which there was a reversal on this account), the language of the court forbids the construction that it would, under all circumstances, be error to proceed with the trial of a prisoner, without removing his

[Faire v. The State.]

shackles. The language of the court was, " To require a prisoner, during the progress of his trial before the court and jury, to appear and remain with chains and shackles upon his limbs, without evident necessity for such restraint, for the purpose of securing his presence for judgment, is a direct violation of the common law rule, and of the thirteenth section of our criminal practice act. In the present case, there is no pretense of necessity for the manacles and chains upon the defendants, during their trial, to secure their presence to answer the judgment." It was stated in the bill of exceptions that " no circumstances or facts were shown to the court why a different rule should be enforced in this cause than any other." The defendants were tried for the crime of robbery. It should be observed that under the California judicial system, an appeal lies to their Supreme Court from an order granting or refusing a new trial. We think some importance should be attached to the fact, that in that case the decision of the court that the prisoner was entitled to appear for trial "free from all manner of shackles or bonds," is qualified by the emphatic language, "unless there is danger of his escape." All these authorities concede, that there may be circumstances—danger of the prisoner's escape—which would justify placing fetters upon him.

This court has no right or power to entertain appeals from orders of the inferior courts, granting or refusing new trials, or granting or refusing continuances or changes of venue. These are confided to the sound discretion of the courts of primary jurisdiction. And, inasmuch as there are cases in which it is permissible to try prisoners with shackles on them, we confess ourselves unable to lay down any rule for the guidance of the primary courts, except to leave the question to their sound and enlightened discretion. Of course, no prisoner, while undergoing trial, should be exposed to the discomfort or mortification of any description of shackles or bonds, unless his conduct in prison, or other satisfactory evidence, create a reasonable belief that such restraint is necessary to prevent his escape ; or, perhaps, to prevent a rescue, if surrounding circumstances give sufficient evidence of the danger. It is the duty of the sheriff to keep the prisoner in safe custody, that he may abide the judgment of the law ; and his watchfulness, sanctioned and controlled by the court, will rarely err in the exercise of such power. As we have said before, we know not how to lay down a rule for the administration of an appellate jurisdiction over such precautionary measures.

In this case, the record informs us that the prisoner had made to the sheriff violent threats, in case he was convicted.

(6)

He was indicted and to be tried for an alleged murder, committed without warning, and by assassination. The presiding judge and sheriff, each filling very responsible offices, and acting under a solemn official oath, could much better judge of the necessity of extraordinary restraint, than we possibly can. It is contended, however, that there should have been a public inquiry and ascertainment of this necessity, and that the prisoner should have been allowed to be present, and confront and controvert the evidence offered, if he desired. The prisoner's arms were free, but there were clasps on his ankles, connected by a chan 18 inches long, 1¼ inches in diameter. This was discovered by prisoner's counsel while the trial was in progress, and he immediately called the attention of the court to it, and asked that they be removed. The court replied, it was done by order of the court, on representations made by the sheriff. To the motion of defendant that the shackles be removed, the court proposed to have the sheriff sworn as to the cause of the shackling, when the defendant, by his counsel, stated that he did not want that done, as he did not know what the statement of the sheriff might be; and defendant withdrew the motion, but asked the court to note what had taken place, relating to the prisoner being in irons, and allow an exception thereto, which was granted by the court. The prisoner was not in irons during the first day of the trial, but was shackled, as above shown, during the second day.

The bill of exceptions states that "the representations made by the sheriff, and which were the cause of the court ordering the irons to be kept on defendant during his trial, were made to the court in open court, but not under oath, and inaudibly to any save the court, and not in a voice to be heard either by the jury, the defendant, or his counsel; and were, in substance, that the prisoner stated to the sheriff, who had him in charge, that he would rather die than be hung or sent to the penitentiary; and if the jury found him guilty, he would not come out of the court house alive, but that he would escape, or the officer would have to shoot him. The sheriff further stated, that from the character of the man, and his conduct in jail, he entertained serious apprehensions that the prisoner would attempt to escape and create a scene in the court room, if not secured. The court told the sheriff to take the necessary precaution to prevent any attempted escape, but not to place the irons on his hands, and make it as little apparent as possible, and not in the presence of the jury; and this was done."

As we have said above, the judge and the sheriff were sworn officers; and we think it is not a violation of the usages

[Faire v. The State.]

of courts, nor of any right of the prisoner, for the court, in incidental matters, connected with the conduct of the business of the court, to act on the statement of its executive officer, without requiring of him an oath of the truth of his representations.   And we think that to require a public disclosure and trial of the facts, as a preliminary to the placing of irons on prisoners undergoing trial, would be much more likely to create a prejudice against the prisoner than quietly to order the same, as was done in this case.

The practice of the Lord Chief Justice Holt, we think, should weigh nothing against these views.   The remark imputed to him, as we understand it, was made in the trial of a cause which was marked by no facts or circumstances rendering it necessary that the prisoner should be shackled. The remark did honor to his head and heart, and was intended, as its language imports, to express more a rule of judicial propriety, than of municipal law.   He was dealing with a custom, then become common and oppressive, and not with a case, whose circumstances showed the necessity of bands to prevent escape.   To shackle prisoners without cause, is certainly a revolting practice.   We do not think there ever has been an unbending rule of law, that no prisoner, under any circumstances, can be brought to trial in irons.   True, it should rarely be done, and never, except in cases where the circumstances show real danger of escape, or, perhaps, of rescue.   But we do not think that, under our system, this question can be raised as cause of reversal in this court.

For the error above pointed out, the judgment of the City Court is reversed, and the cause remanded.   Let the prisoner remain in custody until discharged by due course of law.

BRICKELL, C. J.—I cannot assent to the proposition, that it is mere matter of discretion with a judge, whether the prisoner shall be brought to the bar, or tried in fetters. There may, possibly, be a necessity for fettering a prisoner, and if such necessity should be shown, it may be the duty of the court to order it.   The action of the court is, in my judgment, revisable, and a judgment of conviction should be reversed, if it did not clearly appear that there was an immediate, pressing necessity for the order, which it is admitted should be made only in exceptional cases.