[Opinion delivered March 3, 1886.]

[No. 1980.]

## J. H. RAINEY *v.* THE STATE.

1. PRACTICE — EVIDENCE.— It is a statutory and well settled rule of evidence in this State that "when part of an act, declaration, conversation or writing is given in evidence by one party, the whole may be inquired into by the other." And it is further enacted that, "when a detailed act, declaration, conversation or writing is given in evidence, any other act, declaration or writing which is necessary to make it fully understood, or to explain the same, may also be given in evidence." (Code Crim. Proc., art. 751.) See the opinion for evidence properly admitted under this rule.

2. SAME.— Article 2252 of the Revised Statutes provides that "copies of the records of all public officers and courts of this State, certified under the hand and seal (if there be one) of the lawful possessor of such records, shall be admitted as evidence in all cases where the records themselves would be admissible." *Held,* that the said article is cumulative in effect and not restrictive, and therefore does not affect the rule or right with regard to the admissibility of the originals as evidence. An original writ of attachment is competent evidence of its issuance and existence.

3. SAME.— The doctrine obtains in this State that if a process, fair and regular on its face, is placed in the hands of an officer for service, he will be protected in serving it, although he may know of the existence, back of it, of facts which render the process null and void. The trial court, therefore, committed no error in refusing to permit the defendant, after the State had introduced the original writ of attachment in evidence, to introduce the affidavit and bond upon which the writ was founded, to show that the said affidavit and bond were defective, nor in refusing, at a later stage of the trial, to admit evidence to show that the officer knew of the defects in the bond and affidavit.

4. SAME.— The State proved, on a trial for murder, that when the deceased, in his official capacity as constable, sought admission to the house of the defendant, the defendant met him with a gun in his hand, and, in reply to the deceased's remark: "Old man, you look like you were on the war-path," the defendant replied, in substance, that he had once been whipped and beaten like a dog and driven from home, and, therefore, wanted to know the business of every man who came to his house. In explanation of the fact thus proved by the State, the defendant proposed to prove by his wife that some four months before the homicide, one M. and his wife came to defendant's house and called witness out, and that M. covered the defendant with two six-shooters and forced him to assume and retain a kneeling posture while Mrs. M. chastised him with a quirt; and that in consequence of that, and of

threats of further violence, the defendant abandoned his home and moved off with his family. *Held,* that the proposed evidence was properly excluded in view of the proof that the deceased announced the legal and official character of his presence, and that the homicide was committed more than an hour afterwards, and several miles distant from the defendant's house.

5. SAME.— That a witness did not hear the whole of a conversation, and was therefore unable to repeat it either in words or substance, is no reason for refusing to permit him to testify to such words as he did hear. See the opinion in illustration.

6. SAME.— Both the English and American systems of practice require that when a manacled prisoner is brought to the bar of the court for trial, his manacles shall be removed, except in extreme cases when the safe custody of the prisoner and the peace of the tribunal imperatively demand the retention of the manacles. The defendant in this case was brought into court chained in a gang with several other prisoners. As soon as he was seated within the bar the court ordered the removal of his shackles. His counsel saved an exception to the action of the sheriff as illegal and calculated to prejudice the defendant before the jury. The trial judge explained the exception as follows: "The sheriff deemed it unsafe to deal with the number of prisoners he had to bring out, without chaining them together, and the chains were removed by my order as soon as I saw they were in the court room." *Held,* that the sheriff was authorized to exercise precaution commensurate with the safe custody of his prisoners, and the action of the court in the matter was proper.

7. SAME.— Appellant and J. E. R. were impleaded in the same indictment. J. E. R. was placed upon trial as soon as the jury in this case retired to consider of their verdict. Pending verdict in this case the court sent to the jury room for the indictment in order to arraign J. E. R. upon the same. The purpose for which the indictment was withdrawn was not communicated to the jury in this case. *Held,* that the proceeding was without error, or prejudice to the defendant.

8. SAME.— *Ex parte* writings, attached to the transcript as addenda or explanatory notes, become no part of the record, and will, as in this case, be stricken out, and not considered.

9. MURDER — FACT CASE.— See the statement of the case for evidence *held* sufficient to support a conviction for murder in the second degree.

APPEAL from the District Court of Cooke. Tried below before the Hon. F. E. Piner.

The indictment in this case charged the appellant and J. E. Rainey, jointly, with the murder of J. D. L. Johnson, in Cooke county, Texas, on the 14th day of February, 1885. A severance having been awarded upon the application of the impleaded parties, the appellant was first placed upon his trial, and was convicted of murder in the second degree, his punishment being assessed at a term of thirteen years in the penitentiary.

Thomas Bailey was the first witness for the State. He testified that he was, and for a number of years had been, a practicing phy-

sician.   His residence was in the town of Marysville, Cooke county,
Texas.   He knew the defendant, and knew J. D. L. Johnson, the
deceased, in his life-time.   J. D. L. Johnson died at Sadler's Bend,
in Cooke county, Texas, on the 14th day of February, 1885.   The
witness examined his dead body on the morning of the 15th, for
the purpose of ascertaining the cause of his death.   His death re-
sulted from gun or pistol shots.   One ball passed through his head,
another through his body, and a third took a nick out of one of his
ears.   The forehead was fractured.   The ball first mentioned passed
into the head at the right temple and came out just above the left
ear.   The second ball mentioned entered his body from behind im-
mediately under the right shoulder blade, and passed out in front,
and near the collar bone, between the second and third ribs.   The
course of this ball was straight through the body.   The witness
thought, though he did not probe for it, that the ball through the
head followed a perfectly straight course.   The balls fired through
the head and body, judging from the wounds, were about forty-fives
in caliber.   Either of the two principal wounds would, in all proba-
bility, have produced death.   The fracture of the skull was directly
across the forehead, the arch over the left eye being broken.   The
face was powder-burned.   The bullet hole in the temple was smaller
than at its point of exit over the left ear.   The hole under the
shoulder blade, where the other ball entered the body, was smaller
than at the point under the collar bone where the ball made its exit.
The witness observed the holes made in the deceased's clothing by
the ball in its passage through the body.   The hole on the back of
the shirt, where it went in, was larger than on the front where it
.passed out.   The hole in the back was smooth, while that in front
was ragged and torn.   Witness knew one Floyd.   He saw Floyd on
the evening of the shooting of Johnson, and then examined some
gun or pistol shot wounds on his person.   One ball entered Floyd's
right cheek, passed down through the palate of his mouth, and
lodged in his lower jaw, from which place the witness cut and took
it out.   Another ball took effect in Floyd's rump, and ranged up to
the hip bone, from which lodgment the witness removed it.   The
balls removed from Floyd's mouth and hip were forty-fives in cali-
ber.   The fracture of Johnson's forehead was, in the opinion of the
witness, the result of a force other than a gun or pistol shot.   A
ball passing through the head could not have made such a fracture
in the forehead.   The fracture of Johnson's forehead could have
been made with a gun barrel. ·
     Cross-examined, the witness testified that there were no bruises

on the skin of the forehead or other mark to indicate that the fracture was made by a blow. It would require a blow of considerable force to fracture a forehead in the manner that Johnson's forehead was fractured. The left eye was black from the settling of blood.

J. B. Davis was the next witness for the State. He testified that he was the justice of the peace of precinct number five of Cooke county, and lived at the town of Marysville, in that county. He knew the defendant, and knew the deceased, who was the constable of the said precinct. Deceased was killed in Sadler's Bend, Cooke county. Witness last saw him alive on the evening of February 14, 1885, at which time witness gave him for execution a writ of attachment. The said writ was sued out by the plaintiff in the cause of *Serena Nelson* v. *J. H. Rainey*, then pending in witness's court, and was to be levied upon the property of J. H. Rainey, the defendant on trial. Witness at the same time gave the deceased two citations, one to be served on J. H. Rainey and the other one to be used in making return. Witness gave these papers to the deceased between 2 and 3 o'clock on the evening of February 14, 1885. The attachment and one of the citations were found among the papers taken from Johnson's dead body. Witness identified the attachment in evidence as the one he issued and gave to the deceased on the evening stated.

Cross-examined, the witness testified that he first issued the attachment on the 7th day of January, 1885. It was afterwards returned to the witness without the officer's indorsement or "return," and was, by the witness, placed with the other papers in the cause, where it remained until February 14, 1885. At about 1 o'clock on that day the witness got the attachment from among the papers, changed the date from January 7th to February 14, 1885, and the return day from January 19th to March 16, 1885, and gave it to deceased, with the two new citations mentioned. Deceased requested witness to issue the attachment. No new affidavit or bond was made when the attachment was re-issued. An affidavit and bond for attachment were filed in the case previous to the original issuance of the attachment.

Re-examined by the State, the witness stated that, in saying that Johnson requested him to issue the attachment, he meant to say that, on February 14, 1885, Johnson came to him at his office and told him that the Raineys were on the Texas side of Red river with a wagon and team, and that "they" wanted to attach the wagon and team. He did not say whom he meant by "they." Johnson was not present when the witness re-issued the attachment.

That paper was originally issued by the witness on the 7th day of January, 1885. It was returned, without the officer's indorsement, on the 16th day of January, and was, as stated, re-issued by the witness on the 14th day of February, 1885.

The State then introduced in evidence the writ of attachment and the citation, which were identified by the witness Davis as the documents issued by him on the 14th day of February, 1885. The writ of attachment reads as follows:

"THE STATE OF TEXAS, *To the Sheriff or any Constable of Cooke County — Greeting:*

"We command you that you attach forthwith so much of the property of J. H. Rainey, if to be found in your county, repleviable on security, as shall be of value sufficient to make the sum of $56, and the probable costs of suit, to satisfy the demand of Sereny Nelson, and that you keep and secure in your hands the property so attached unless replevied, that the same may be liable to further proceedings thereon to be had thereon before the justice's court, in and for precinct number 5, in the county of Cooke and State of Texas, at the office of J. B. Davis, justice of the peace, in Marysville, on the 16th day of March, 1885; when and where you shall make known how you have executed this writ.

"Given under my hand this 14th day of February, A. D. 1885.

"J. B. DAVIS,

"Justice of the Peace, Prec. 5, Cooke Co., Texas."

Indorsed: "No. 44. Sereny Nelson, plaintiff, vs. J. H. Rainey, defendant. Attachment for $56 on note. 'I hereby deputize Booth Weaver to execute this writ. This 20th day February, 1885. J. B. Davis, J. P., Prec. 5, Cooke Co., Texas.'"

The figures "16" are written over the figures "19" erased, and the word *March* over the word *January* erased, in the body of the instrument. In the jurat of the justice of the peace the figures "14" and the word *February* are written over the figure "7" and word *January*, erased.

The citation reads as follows:

"THE STATE OF TEXAS, *To the Sheriff or any Constable of Cooke County — Greeting:*

"You are hereby commanded to summon J. H. Rainey, if he be found within your county, to be and appear before me, J. B. Davis, a justice of the peace in and for precinct No. 5 of the county of Cooke, at my office, in the town of Marysville, on the 16th day of March, A. D. 1885, there and then to answer unto Serena Nelson, in a plea of debt of $56, by note due and unpaid.

"Herein fail not, and due return make as the law directs, on the 16th day of March, A. D. 1885, the return day hereof.

"Given under my hand, this the 14th day of February, 1885.

"J. B. Davis,

"J. P. Prec. No. 5, Cooke Co., Texas."

Indorsed: "No. 44. To March term, 1885. Serena Nelson v. J. H. Rainey. Citation. Issued 14th day of February, 1885. J. B. Davis, J. P. Prec. No. 5, Cooke Co., Texas."

Joseph Lowery was the next witness introduced by the State. He testified that he knew the defendant and was acquainted with J. D. L. Johnson during his life-time. He last saw Johnson alive between 4 and 5 o'clock on the evening of February 14, 1885. About 1 o'clock on that day Johnson deputized the witness to go with him to Rainey's old place, about three miles northwest of Marysville, in Cooke county, to assist him in the levy of a writ of attachment on the property of J. H. Rainey, the defendant. The defendant at that time was living across Red river in the Indian Nation, but was on that day on a visit to his old home place. Witness and Johnson left Marysville between 1 and 2 o'clock P. M., and reached Rainey's place between 2 and 3 o'clock P. M. They hitched their horses to the fence and started towards the barn, at which place they saw the defendant and J. E. Rainey, Elmer Rainey and Indian Bill McDonald. The parties named were loading a wagon with millet. The witness and the deceased, when they hitched their horses and got over the fence, were in plain view of the parties engaged in loading the wagon, and not over forty yards distant. When witness and deceased had traversed perhaps a third of the intervening distance, the "old man," defendant, started around the fence towards the house, seventy-five yards away, in a trot. He went on to the house, and into the house through a door on the opposite side of the house from the witness and Johnson, and almost immediately returned with a double-barreled shot-gun in his hands. When the defendant started to the house witness and Johnson turned and walked to the yard gate. J. E. Rainey, Elmer Rainey and Bill McDonald walked across the lot to the yard gate, where they met witness and Johnson. J. E. Rainey was wearing a six-shooter about his person. Witness and Johnson had been at the gate with J. E. Rainey, Elmer Rainey and McDonald but a few minutes when the defendant came to the gate with his double-barreled shot-gun in his hand. When he thus approached the gate, Johnson said to him: "Old man, you all look like you are on the war-path." The defendant replied: "No farther than to protect my rights. I always like to know a man's business when he comes on my place."

Johnson had with him a warrant for the arrest of Elmer Rainey for carrying a pistol. When defendant came to the gate, Johnson asked him if the party with him was Elmer Rainey. Defendant replied in the affirmative, and Johnson told him that he had a warrant for the arrest of Elmer for carrying a pistol, and would have to take him into custody. He then produced and read the warrant to Elmer. Defendant asked if Johnson could not accept an appearance bond for Elmer. Johnson asked who he proposed to give as surety. Defendant replied that he would give Jim Wright. The deceased replied that Wright was responsible and would be accepted. Johnson then turned Elmer over to the witness and all parties went to the barn. At the barn Johnson asked the defendant if he owned the wagon and team. Defendant replied that he did. Johnson then told the defendant that he had an attachment against his, defendant's, property, and would have to levy it on the wagon and team. He then produced the attachment and commenced to read it to the defendant. The parties were then standing near the wagon. Defendant told Johnson that he need not read the attachment, as he would not hear it. Johnson replied that he would comply with the law, which required him to read it to defendant. Defendant then told Johnson that he was not going to surrender the wagon and team, but was going to take the same across the river on that evening. Having read the attachment, and attached the wagon and team, Johnson sat down between the wagon and the barn, and proceeded to fill out a bond. While Johnson was thus engaged, defendant and J. E. Rainey retired to a short distance and engaged in a private conversation. The defendant then hitched the team to the wagon, and meanwhile two horses were saddled and brought to the fence and tied. Witness then called Johnson to him. The Raineys, witness and Johnson then started to the house of Jim Wright, and the house of someone else whom witness could not remember, to enable Elmer to give an appearance bond in the pistol case, and defendant to execute a replevy bond for the wagon and team. Defendant, driving the wagon, traveled in front, witness and Elmer Rainey, on horseback, followed next in order, and Johnson and J. E. Rainey, on horseback, brought up the rear, none of the parties being over forty yards apart. The road on which the party was traveling forked at a point about one and a half miles distant from the defendant's house. One of the prongs led to Jim Wright's house, and the other to the Jimtown crossing of the Red river. Instead of taking the road to Wright's house, the defendant took the road to the Red river and drove his wagon over it in a

trot. Witness and Elmer Rainey stopped at the forks, and Johnson loped on after the wagon, telling witness to wait at the forks and that he would soon be back. Johnson overtook the defendant in his wagon about forty yards beyond the witness, rode up alongside the wagon, and said: "Mr. Rainey, you know I can't let you (take) this wagon and team across Red river." This was all of the conversation which ensued between Johnson and defendant that the witness heard. The defendant did not stop, but urged his team over the road in a trot, and with Johnson passed out of the witness's sight. When the witness last saw him defendant had his gun across his lap, with the breach in one hand. Witness saw no more of Johnson alive. The point where the defendant and Johnson passed out of the witness's view was about two miles from the place of the killing. J. E. Rainey stopped with witness and Elmer at the forks of the road for a few minutes, and then followed after defendant and Johnson in a lope. The witness and Elmer Rainey waited at the forks of the road about thirty minutes. Johnson not having then returned, witness wrote on a piece of paper: "I am gone to Marysville," left it, and he and Elmer returned to Marysville. With the meanders of the road, the distance from the old Rainey place to the Jimtown crossing of the Red river was about three and a half miles. Defendant at that time was living in the Chickasaw Nation, in the Indian Territory, and his son, J. E. Rainey, wife and children were living at the defendant's place in Cooke county. Witness did not know why J. E. Rainey went with the defendant on this trip. Johnson had his pistol on while at the house, but did not have it out at any time. It was not visible, but was buckled around his waist, and was covered by his overcoat, which was buttoned to the chin. Witness did not, at any time at the defendant's house, see a woman. Johnson served a citation on defendant at the same time that he levied the attachment on the wagon and team. He did not go to the house with Elmer Rainey after he attached the wagon and team, nor did he go to the house at any time, with any one, nor did Elmer Rainey go to the house to get his overcoat or for any other purpose. His, Elmer's, overcoat was hanging on the fence, about twenty steps from the house, and he got it from that point when the party started to Jim Wright's house.

Cross-examined, the witness testified that the attachment was levied on the wagon and team when they stood near the barn, but the citation was served on the defendant at the house. After the defendant told the deceased that he need not read the attachment, and that he, defendant, was going to take the wagon and team across.

the river, he stood his gun up against the wagon and finished load-
ing the wagon with millet. The gun was left nearer witness and
Johnson than to the defendant, and either witness or Johnson could
easily have secured it if they had tried. The gun was at the wagon
during the time that defendant and J. E. Rainey were engaged in
private conversation, some little distance off. The witness denied
that, upon a former trial of this case, he testified that the attach-
ment read by Johnson to the defendant called upon its face for a
wagon and team or wagon and two horses. He testified that John-
son read an attachment for a wagon and team. It was the under-
standing of the witness, when the party left the old Rainey place,
that they were going to Jim Wright's house for Elmer to execute an
appearance bond and the defendant a replevy bond. Witness did
not testify upon the examining trial that it was agreed between him
and Johnson that one or the other was to take Elmer Rainey to Jim
Wright's house to make bond. If his testimony so appears in the
record, it is a mistake.

John Stewart was the next witness for the State. He testified
that he lived in Sadler's Bend, Cooke county, Texas, about two
miles distant from the Jimtown crossing of the Red river. On
the evening of February 14, 1885, the deceased came to witness's
house and summoned witness and Newton Floyd to go with him
and assist him in taking a wagon and team from the defendant,
which he, the deceased, had attached. He asked if witness had
any arms. Witness told him that he had a double-barreled shot-
gun, and deceased told witness to get and load it quickly as he
wanted to overtake defendant before he got to the crossing of Red
river. Witness loaded the gun, putting twelve buck shot in each
barrel. Floyd caught the horses, and the witness, Floyd and John-
son started in a lope over the public road towards the Jimtown
crossing, witness in the lead. They met J. E. Rainey, the defend-
ant's son, in the bottom about a quarter of a mile from the place
where they overtook the defendant in the wagon. Witness, John-
son and Floyd were then traveling north towards the river, and J. E.
Rainey south from the river. J. E. Rainey turned and rode back
with the party in a lope. When the pursuing party reached a point
within two hundred yards of defendant, who was then traveling
in a trot, J. E. Rainey uttered a loud yell, and defendant whipped
his horses into a lope, and turned across a sand beach to take a
near cut to the river. One Pattie was met on the road. From him
Johnson got a Winchester rifle and rode on in a lope after the
wagon, witness and Floyd with him. When the wagon was over-

hauled, Johnson rode in ahead of the team, caught the bridle of one of the horses, and told defendant that he had attached that wagon and team, and wanted it. Defendant raised himself upright in the wagon, leveled the shot-gun at Johnson, and told him to release the horse. The defendant at the same time, with one hand, reined his horses from the road across a small ravine, and threw the lock on his wagon, and held the gun on Johnson with the other hand. When the ravine was crossed, Johnson again caught the bridle of one of the horses, and again said that he had attached the wagon and team, and wanted it. Defendant sprang from the wagon with his gun in his hand, went around the wagon, met Johnson and leveled his gun on him. They met about the shoulders of the wagon horses,— Johnson at the time having the Winchester rifle in his hand but making no effort to shoot. Johnson at that time told defendant that he did not want to hurt him, but as he had seized the wagon and team under the attachment, he did want them. Johnson, at the time of the meeting at the head of the horses, caught the muzzle of defendant's shot-gun and threw it up. Defendant caught hold of Johnson's gun and a scuffle ensued. Just as Johnson was on the point of getting defendant's gun away from him, the defendant, speaking to his son, J. E. Rainey, said: "Kill him, Jim." Thereupon J. E. Rainey, who had been standing off some ten or twelve feet, rushed up and shot Johnson through the back, and Johnson fell flat on his back. J. E. Rainey then turned and fired at, but missed, the witness. Witness did not know whether that shot struck anybody else. Floyd was then standing behind the witness on the bank of the ravine. Witness and J. E. Rainey were in the ravine. J. E. Rainey fired at witness again and missed him, and then turned and shot Floyd through the cheek. J. E. Rainey then turned again, covered witness with his pistol and ordered witness to drop his gun, which witness did, and backed off some twenty feet. J. E. Rainey then got witness's gun, and the witness had never seen it since. Witness did not know what the defendant was doing while J. E. Rainey was shooting at witness and Floyd. When the pursuing party overtook the wagon, Johnson told witness and Floyd to dismount, and told witness to watch "Jim,"— J. E. Rainey. Witness first saw J. E. Rainey's pistol about the time Johnson told him and Floyd to get down. J. E. Rainey at that time pulled his pistol from his breast. Five shots in all were fired, and all of them were fired by J. E. Rainey. When J. E. Rainey ran up to Johnson in answer to defendant's call, witness ordered him to halt or "hold up," and

snapped both barrels of his gun at him. His gun refused to fire. He snapped the first barrel just after Johnson was shot, and the second when J. E. Rainey turned and threw his pistol down on him, witness. Johnson made no effort to shoot or hurt the defendant. The killing of Johnson occurred in precinct number 5, Cooke county, Texas.

Cross-examined, the witness testified that he rode in the lead with his gun from the time he left his home with Johnson and Floyd, until the wagon was overtaken. He had no recollection of seeing Johnson's pistol at any time, and did not see Floyd with a pistol, nor did he see Johnson give Floyd a pistol. Witness denied that on the preliminary trial of this case he testified that Johnson had both a pistol and a Winchester rifle when he caught the horses of the defendant. Defendant's team did not stop until Johnson rode in ahead of them, dismounted and stopped them, and the pursuers did not dismount from their horses in the rear of the wagon. Witness knew O. H. Weir, and saw him on the evening of the killing. He did not at that time tell Weir, in words or substance, that Johnson was dead and that Jim Rainey killed him, but that if his, witness's, gun had not refused to fire, Johnson would be the living and Jim Rainey the dead man. Witness did not hear J. E. Rainey say or do anything to Johnson until defendant said: "Kill him, Jim." Witness did not hear J. E. Rainey say to him or Floyd: "Hold up." Defendant, J. E. Rainey and the witness were friendly at the time of the killing, and always had been. There was a pathway down through the mountains from the Rainey farm to the Jimtown road. Parties traveling that route would have to travel the Jimtown road about a half mile to reach a point south of the killing. Witness could travel the road in less time than he could go through the mountains.

Newton Floyd testified, for the State, that he lived with the witness John Stewart. J. D. L. Johnson came to Stewart's house on the evening of February 14, 1885, and summoned Stewart and the witness to go with him to take a wagon and team from the defendant, upon which he said he had levied an attachment. Stewart got his gun, and witness caught horses, and he and Stewart went with Johnson. They traveled the public road towards the Jimtown crossing of Red river, which point was about a mile and a half distant from Stewart's house. The wagon driven by the defendant was overtaken within two or three hundred yards of the river. J. E. Rainey was met going south from the river. He turned and loped back north with the pursuing party. When the party got in sight

of the wagon, J. E. Rainey yelled, and the defendant, who was then traveling the public road in a trot, turned the horses and wagon out of the road and struck across a sand-bank to a nearer point on the river, whipping his horses into a lope. Johnson got a Winchester rifle from Bill Pattie, who was standing near the Jimtown road, and the party passed on rapidly in pursuit of the defendant. When Johnson overhauled the wagon he ordered defendant to stop, saying that he had attached and wanted the wagon and team. Defendant replied that he would not stop. Johnson then passed to the front and seized the check-reins on the horses. Defendant leveled his gun on Johnson, and told him to release the horses. Johnson replied that he did not want to hurt defendant, but that he had attached the wagon and team, and intended to have them. Thereupon the defendant made a short turn with his wagon and drove across a ravine (Camp creek), when Johnson again stopped the team. Defendant then sprang out of his wagon with his gun in his hand. He met Johnson about the head of the horses, Johnson having the Winchester rifle in his hands. Johnson seized the defendant's gun, throwing the muzzle up. Defendant seized Johnson's gun, and a scuffle over the weapons ensued. Johnson at that time had only the Winchester, having passed his pistol to the witness when they first caught up with the wagon. When the scuffle over the guns began, witness, John Stewart and J. E. Rainey were standing on the opposite side of the ravine, some ten or twelve feet distant. J. E. Rainey was somewhat nearer Johnson and the defendant than either Stewart or witness. After scuffling a few seconds defendant called to J. E. Rainey to shoot Johnson, and J. E. Rainey ran up and shot Johnson in the back. He then turned and fired at Stewart, missed him, but struck the witness in the rump, that part of the witness's anatomy being in the range. Witness fell, and J. E. Rainey fired again, the witness thought at Stewart, but he again missed Stewart and lodged his ball in witness's jaw. J. E. Rainey then made Stewart lay down his gun, which he, J. E. Rainey, took. Defendant came up to witness, covered him with his gun, and said: "I want your pistol." Witness replied: "There it is." He took it, and he and J. E. Rainey left, going across Red river. Witness got up a few minutes later, mounted Johnson's horse, and went back to Stewart's house with Houston Lee. He met no one on the road going back to Stewart's. He saw nothing of a man, woman and children on horseback. He knew Bill McDaniel and wife. They were not on the road when witness passed over it going back to Stewart's, or he certainly would have seen them. When witness

and Stewart dismounted at the wagon, J. E. Rainey drew his six-shooter and told Stewart and witness to "hold up." This occurred at the moment defendant covered Johnson with his gun and ordered him to release his horses. Witness had never seen either of the Raineys prior to that day, and consequently there was no ill-feeling existing between him and them. J. E. Rainey did all of the shooting.

John Ford was the next witness for the State. He testified that he was a deputy sheriff of Cooke county, Texas, at the time of the killing. Witness went to the scene of the killing, and thence into the Indian Territory and to the defendant's house. He searched around the county for about six days, but failed to find the Raineys. He first saw them after the killing about April 1, 1885, in the Cooke county jail. When witness went to the place of the killing, he got Pattie's Winchester rifle, and had Pattie throw the cartridges out and then counted them. Twelve cartridges were thrown out. Witness could find no Winchester rifle cartridge shells about the place of the killing. From Rainey's old farm to the place of the killing, following the meanders of the road, the distance was about six miles. A bridle pathway from old man Rainey's farm came into the Jimtown road about a half a mile from the place of the killing. It would take longer to travel that route through the mountains than to go by the road.

A. M. Hill testified, for the State, that he was the sheriff of Cooke county at the time of the killing. About six weeks after the killing the defendant was turned over to witness at Fort Worth by a deputy sheriff of Brown county.

Mr. Ward testified, for the State, that he lived on John Stewart's place on the Jimtown road. Two men, on the evening of the killing,— one in a wagon containing some straw, and the other on horseback,— passed witness's house. The man in the wagon said: "Let's get on across Red river, and maybe they won't bother us." The other man replied: "They will not take you while I live, for I will fight till I die." After a short time three men, one of whom was John Stewart, passed witness's house going in the same direction. The State closed.

Elmer Rainey was the first witness for the defense. He testified that the defendant was his father. Witness was at the "old place" when Johnson and Lowery arrived. When Johnson dismounted from his horse, he had his pistol drawn. Witness did not know how long he kept it drawn. He did not have the pistol out when he arrested the witness. Johnson did not serve the defendant with a citation, nor did he read an attachment to the defendant. He said

nothing to the defendant about an attachment. He said that he had
no papers for the defendant or for J. E. Rainey, but that he had a
warrant for the arrest of the witness. Johnson went with the wit-
ness to the house from the barn to get his, witness's, coat. While
at the house, Johnson asked Bill McDaniel's wife what she was doing
there. She told him in reply that her husband had rented the place,
and that they were going to occupy it for the next year. Johnson
replied to her: "You had better leave here, for I will kill all the
Raineys and all their renters before they shall live on the place."
Witness got his pistol and his coat while in the house. He was
then seventeen years old, and was under arrest for carrying a pistol.

Mrs. McDaniel, testifying for the defense, corroborated the testi-
mony of Elmer Rainey as to what transpired at the house, and
stated, in addition, that she told her husband, Bill McDaniel, about
the conversation with Johnson, and that, soon after the departure
of the parties, her husband caught their horses, and he and witness
and their two children took the pathway through the mountains to
the ferry. They reached a point on the road about one hundred
and fifty yards from where the killing occurred about the time the
difficulty began. They stopped at that point and witnessed the en-
tire difficulty from the backs of their horses. Johnson and defend-
ant got into a scuffle for the possession of their guns. Johnson's
gun, while still in his hands, was discharged in the defendant's face.
A second shot was soon fired at the wagon, and then J. E. Rainey
ran up and shot Johnson with a pistol. Witness and her husband
turned back and road home over the Jimtown road. They reached
home about dark, having seen no one on the road.

O. H. Weir testified, for the defense, that he saw John Stewart
on the evening of the killing. Stewart told him that if his gun had
not missed fire, Johnson would have been living, and J. E. Rainey
dead. His exact words were: "If my gun had fired Jim Rainey
would be a dead man."

Bill Pattie testified, for the defense, that as Johnson, Stewart and
Floyd passed him and Mr. Hughes on the Jimtown road, he let
Johnson have his Winchester gun. Witness had recently loaded
that gun, filling the magazine, which would hold twelve cartridges.
Witness heard the shooting a few minutes after Johnson got his
gun. Four shots were fired, all of them by J. E. Rainey. Witness
went forward and got his gun from Johnson's body. He threw the
cartridges out for Ford, and it was his recollection that only ten
cartridges were found in the magazine. The cartridge in the barrel
had a small "peck" on it which seemed to have been made by the

weight of the hammer. Witness did not think the "peck" was made by a snap of the hammer. Witness saw nothing of a man, woman and children on the road at the time of the shooting. If any man, woman and children had come to the point on the road said to have been occupied by Mrs. McDaniel, her husband and children, they would necessarily have had to pass Mr. Hughes. Witness saw Houston Lee and a man named Airhart near the place of the killing. Witness knew Bill McDaniel and his wife. He saw nothing of them, anywhere, on the day of the killing. Witness found no cartridge shells about the place of the killing. A man could not hold and discharge a Winchester rifle with one hand. Defense closed.

Alex. Ely testified for the State, in rebuttal, that he saw Bill McDaniel standing in the yard at the Rainey "old farm," about half an hour before sunset on the day of the killing.

W. P. Gaston testified for the State, in rebuttal, that he lived about three hundred yards from the Rainey old farm in Cooke county. Witness was engaged hauling hay from the Rainey farm on the evening of the killing. While in the field, at about an hour by sun, Jim Rainey's two step-sons drove McDaniel's two horses west and returned with them about dusk. McDaniel, riding one of the same horses, came to witness's house after dark, and stayed all night. The two horses driven by Jim Rainey's boys were the only horses McDaniel had, and were the horses he worked in the field.

The motion for new trial raised the questions discussed in the opinion.

*A. M. Thomason* and *W. B. Johnson* filed an able brief and argument for the appellant.

*J. H. Burts*, Assistant Attorney-General, for the State.

WHITE, PRESIDING JUDGE. 1. On the cross-examination of Davis, the justice of the peace, a witness for the State, defendant's counsel had asked him "who, if any one, requested you to issue the writ of attachment or citations?" He answered "J. D. L. Johnson, the deceased." On re-examination by the State as to this point, the witness was asked "What was said by Johnson when he requested the issuance of the writ and citations?" and he answered, "Johnson said they wanted them renewed." Which question and answer were objected to by defendant. If the matter had been allowed to remain in the attitude it was made to assume by the question asked

and answer elicited by defendant, the inference would have been that Johnson, the deceased constable, of his own motion and without authority from the parties at interest, procured through officiousness what they alone had authority to demand,— a re-issuance of the writs. To avoid this imputation, a further explanation of Johnson's acts and declarations became necessary, and the testimony sought and elicited in rebuttal by the State came within the well settled statutory rule that when part of an act, declaration, etc., is given in evidence, the whole may be required. "And when a detailed act, declaration, conversation or writing is given in evidence, any other act, declaration or writing which is necessary to make it fully understood or to explain the same, may also be given in evidence." (Code Crim. Proc., art. 751; *Shrivers* v. *The State*, 7 Texas Ct. App., 450; *Pharr* v. *The State*, 9 Texas Ct. App., 129; id., 10 Texas Ct. App., 485; *Sager* v. *The State*, 11 Texas Ct. App., 110; *Green* v. *The State*, 17 Texas Ct. App., 395; *Penland* v. *The State*, 19 Texas Ct. App., 365.)

2. Objection was made to the introduction in evidence of the original writ of attachment, the objection being that a certified copy of the papers and writ was the best evidence and only proper proof. The rule is otherwise. "Whenever a statute requires that a record should be kept by law, then the record is proper evidence of such acts, and the acts can be proved primarily only by the record." (1 Whart. Ev. (2d ed.), § 65.) This is the general rule. Under our statute, "copies of the records of all public officers and courts of this State, certified under the hand and seal (if there be one) of the lawful possessor of such records, shall be admitted as evidence in all cases where the records themselves would be admissible." (Rev. Stats., art. 2252.) This statute is cumulative and not restrictive; it does not affect the rule or right as to the admissibility of the originals as evidence.

3. After the State had been permitted to introduce the writ of attachment, defendant offered in evidence the affidavit and bond upon which said attachment was issued, and, when objection was interposed, proposed to establish later on by other witnesses that Johnson, the deceased, knew of the defects in said affidavit and bond which rendered the writ of attachment he was attempting to execute worthless and illegal. In *Tierney* v. *Frazier*, 57 Texas, 437, our supreme court quote with approval the rule announced by Mr. Justice Cooley in his work on Torts, to the effect that "when an officer knows that back of process fair on its face are facts which render it void, he is nevertheless protected in serving it;" and Judge

Cooley's conclusions upon the subject are copied in these words: "It seems to us, therefore, that the weight of authority and of reason is clearly in favor of the proposition that the officer may safely obey all process fair on its face, and is not bound to judge of it by facts within his knowledge, which may be supposed to invalidate it." . The action of the court in excluding the proposed evidence seems to be in harmony with this doctrine.

4. Defendant proposed to prove by his wife that, some four months before the homicide, one McGhee and wife came to their house, called defendant out, presented two six-shooters at him, caused him to kneel down, and that McGhee held his pistol pointed at him whilst Mrs. McGhee whipped him with a quirt until his back was black and blue from the waistband to the top of his head. That in consequence of this treatment and other threats and acts of violence, defendant and family abandoned their home and moved to the Indian Territory. This testimony was offered by defendant in explanation of the fact proven by the State, that, when defendant came out of his house and first met deceased, he came with a gun in hand, which caused Johnson to remark to him: "Old man, you look like you were on the war-path," and defendant replied, "I have been whipped and beaten like a dog, and had to leave my home, and I want to know a man's business when he comes here." In view of the facts that Johnson told him his business,— that his business was legal and in discharge of his, Johnson's, official duties,— that the homicide was committed some time, perhaps more than an hour, afterwards and some miles distant from defendant's home, we cannot see what appreciable weight or bearing the proposed evidence could have upon the transactions connected with the killing, or what light it could throw upon the issues involved in the case. Under the facts its exclusion could not certainly have affected the merits of the question of defendant's guilt or innocence with reference to the homicide.

5. Defendant's seventh bill of exceptions shows no merit. But one remark was heard by the witness, and consequently he could not state either the conversation or the substance of the conversation between the parties. He was properly allowed to testify to the only thing which he did hear, to wit, the remark of Johnson to defendant, "Old man, you know I can't bear to see you take this wagon across the river." "It is sufficient, when the spoken words of another are to be testified to, to give their substance." (Whart. Crim. Ev. (8th ed.), § 461.) Because a witness does not hear the whole of a conversation is no reason for the exclusion of that portion of it which he did hear.

6. When defendant was brought into court for trial he was chained in a gang with several other prisoners. The court promptly instructed the sheriff to remove the defendant's chains after he had been brought in and seated within the bar. His counsel saved an exception to the action of the sheriff as illegal and calculated to prejudice the defendant before the jury. In explanation of this exception the learned trial judge says, "the sheriff deemed it unsafe to deal with the number of prisoners he had to bring out, without chaining them together, and the chains were removed by my orders as soon as I saw they were in the court room."

Mr. Bishop says: "It was long ago resolved that when prisoners come to the bar to be tried their irons ought to be taken off, so that they be not in any torture while they make their defense, be their crime never so great. Though the rule at arraignment where only a plea is required is less strict, a prisoner at trial should have the unrestrained use of his reason and all advantages to clear his innocence. Our American courts adhere pretty closely to this doctrine, yet deem that in extreme and exceptional cases, where the safe custody of the prisoner and the peace of the tribunal imperatively demand, the manacles may be retained." (1 Bish. Crim. Proc. (3d ed.), § 955.)

In *The State* v. *Kring*, 64 Mo., 591, the court say, "it seems very clear that without some good reason authorizing the criminal court to depart from the general practice in England and in this country, the shackles of the prisoner, when brought before the jury for trial, should be removed." And again: "When the court allows a prisoner to be brought before a jury with his hands chained in irons, and refuses on his application, or that of his counsel, to order their removal, the jury must necessarily conceive a prejudice against the accused as being, in the opinion of the judge, a dangerous man and one not to be trusted even under the surveillance of officers. Besides, the condition of the prisoner in shackles may to some extent deprive him of the free and calm use of all his faculties." (See same case, 2 Amer. Crim. Repts. (Hawley), 313. See, also, 58 Ala., 74; 10 Lea (Tenn.), 673; 109 Ill., 189.) In the case before us the sheriff acted properly in chaining the prisoners if he deemed it otherwise unsafe to bring them from the jail to the court room; and the judge's action in having the chains removed from defendant before he was placed upon trial was eminently correct and proper.

7. It appears that this defendant and one J. E. Rainey were jointly indicted in one indictment for the homicide. After the jury had retired to consider of their verdict in this case, the case of J. E. Rainey, who had severed from this his co-defendant, was called

for trial, and in order to arraign said J. E. Rainey the indictment which the jury in this case had taken with them in their retirement was sent for by direction of the court, and the defendant J. E. Rainey was duly arraigned upon and pleaded to said indictment,— the jury in this case not knowing the purpose for which it was to be used. No error is shown in this action, nor any possible chance either of injury or prejudice to defendant.

There are two other bills of exception in the record, but they do not in our opinion show sufficient merit to require discussion. There are certain *ex parte* affidavits and documents annexed as an addenda to the transcript, with regard to the statement of facts, and calling in question the action of the trial judge with regard to the statement of facts. These papers are not properly a part of the transcript, and on motion of the assistant attorney-general are stricken out and will not be considered.

It remains only to remark that the charge of the court was a full and able exposition of the law of the case, and that the evidence amply sustains the verdict and judgment of conviction. A zealous and faithful officer of the law seems to have been murdered by defendant and his son, whilst in the discharge of, and solely because he was endeavoring to discharge, his sworn duty as an officer.

The judgment is affirmed.

*Affirmed.*